# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:09-cv-394-RJC

| | | |
|---|---|---|
| **RANDOLPH A. WATTERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **S. WILKINSON and OFFICER** | ) | |
| **GROSCH,** | ) | |
| **Defendants.** | ) | |
| | ) | |

     **THIS MATTER** comes before the Court on a motion for summary judgment by Defendants Stephen Wilkinson ("Wilkinson") and Michael Grosch ("Grosch" and together with Wilkinson, "Defendants"). (Doc. No. 87). For the reasons that follow, Defendants' Motion for Summary Judgment is **DENIED**.

## I.     BACKGROUND

     This is an action brought by pro se Plaintiff Randolph Watterson ("Plaintiff" or "Watterson") pursuant to 42 U.S.C. § 1983. Plaintiff contends that while he was a pre-trial detainee in the Gaston County jail, Defendants, who were working as detention officers at the jail, violated his federal constitutional rights by maliciously and sadistically beating him up in his jail cell and then slamming him against a wall outside of his cell. Defendants admit that an altercation occurred, but they contend that any force used was justified and necessary in order to gain control over Plaintiff and to maintain order in the jail.

     On August 7, 2009, Plaintiff was a pre-trial detainee at the Gaston County jail. Defendants Grosch and Wilkinson were working as detention officers at the jail. It is undisputed that some sort of commotion occurred inside the cell block where Plaintiff was housed and that

Defendants went to Plaintiff's cell. At that time, a physical altercation ensued inside Plaintiff's cell, Plaintiff was sprayed with pepper spray, i.e., mace, and Plaintiff's face was struck by at least one of the officer's hands.

Plaintiff was eventually handcuffed and escorted into the shower area and then to the nurse's station. Plaintiff developed bruising around his eye and ear and a scratch on his nose. Plaintiff was also taken to booking, where a magistrate issued a warrant, charging Plaintiff with assault on a government official. On August 17, 2009, a grand jury indicted Plaintiff on this charge. Plaintiff was later tried and convicted on pre-existing felony charges, and the assault charge was dismissed.

A.    Defendants' Evidence In Support of their Summary Judgment Motion

On summary judgment, Defendants Wilkinson and Grosch contend that on the evening of August 7, 2009, Plaintiff was yelling in his cell and screaming obscenities about another inmate. They went to his cell to try to talk to Plaintiff to calm him down so he would not incite the other inmates. Defendants contend that they unsuccessfully attempted to talk to Plaintiff, who became physically combative. Defendants state that they struck Plaintiff, but they insist that it was in an effort to gain control of him and protect themselves.

Defendants have presented the following evidence in support of the motion for summary judgment: (1) Digitized video footage from the cameras in the jail on the evening of August 7, 2009, with an identifying affidavit from Deputy Hunsucker; (2) Affidavits of Grosch, Wilkinson, Corporal Caskey, Sergeant Davis, Nurse Willis, Alfonso Lewis, Anthony Moore, John McGill, and Stephen Somerset; (3) Affidavit and Report from use of force expert Dave Cloutier; (4) Plaintiff's medical record for August 8, 2009; and (5) Copies of Gaston County criminal records in Plaintiff's case, 09CRS60716, and of the dismissal of the assault on a governmental official

2

charge.

According to Defendants' evidence, on August 7, 2009 around 10:10 p.m., Deputy Grosch and Officer Wilkinson heard a commotion coming from Plaintiff's cell and determined that Plaintiff was causing it by banging on his door and yelling and screaming racially charged remarks and other negative comments at an inmate who was out of his cell and walking around in the common area. (Doc. Nos. 87-3: Aff. of Wilkinson at ¶ 2; 87-2: Aff. of Grosch at ¶¶ 3-4). Defendants initially tried to talk to Plaintiff through an intercom to tell him to stop yelling and banging. (Id.). However, the banging, yelling, cursing, and racial slurs continued. (Id.).

The situation was reported to Corporal Caskey, who then witnessed Plaintiff's behavior. (Doc. No. 87-4: Aff. of Caskey at ¶¶ 9-13). Concerned about potential that the disruption by Plaintiff would cause unrest and riotous behavior throughout the cell block, Defendants went into Plaintiff's cell to attempt to calm him down. (Doc. Nos. 87-3: Aff. of Wilkinson at ¶¶ 4-5; 87-2: Aff. of Grosch at ¶ 5). Defendants tried to talk to Plaintiff, but Plaintiff continued his verbal tirade by yelling about the other inmate and making racially charged comments. (Doc. Nos. 87-3: Aff. of Wilkinson at ¶¶ 4-6; 87-2: Aff. of Grosch at ¶ 6).

Defendant Grosch ordered Plaintiff to sit down on his bunk so that Defendants could talk to him about why he was upset and to calm him down. (Doc. Nos. 87-3: Aff. of Wilkinson at ¶ 7; 87-2: Aff. of Grosch at ¶ 6). Plaintiff would not comply, got up from the bunk, and continued ranting. (Doc. Nos. 87-3: Aff. of Wilkinson at ¶ 7; 87-2: Aff. of Grosch at ¶ 7). Defendant Grosch again ordered Plaintiff to sit down and remain seated, with a warning that if he did not stay seated he would be sprayed with pepper spray. (Doc. No. 87-2: Aff. of Grosch at ¶ 7).

Plaintiff jumped up again and lunged towards the officers, swinging his fists. (Id.). As a result, Officer Wilkinson attempted to administer the pepper spray. (Doc. Nos. 87-3: Aff. of

Wilkinson at ¶ 8; 87-2: Aff. of Grosch at ¶ 7). Plaintiff turned his head and avoided the burst. (Doc. No. 87-3: Aff. of Wilkinson at ¶ 8). The mist landed behind Plaintiff's ear, and the can fell to the ground out of reach. (Id.). Plaintiff continued swinging his fists, attempting to strike both Defendants. (Id.). The officers tried to grab Plaintiff to calm him down, but he continued to resist. (Id. at ¶ 9). The three men ended up on the ground, where Plaintiff still tried to hit and kick Defendants and punched Defendant Wilkinson several times in the chest. (Id.). Plaintiff struck Defendants several times while on the ground and tried to spit on Wilkinson during the struggle. (Id.).

In an attempt to gain control of Plaintiff and protect himself, Wilkinson struck Plaintiff in the face with his hand. (Id. at ¶ 11). Eventually, Plaintiff stopped resisting and Defendants were able to handcuff him. (Id. at ¶ 12). They assisted him to his feet and exited the cell door, which had been open the entire time. (Id. at ¶ 13). From the time that the officers entered the cell, until they came out with Plaintiff handcuffed, less than two minutes elapsed.

After he exited the cell, Plaintiff continued to resist by pulling away, not moving his feet, shuffling, yelling and muttering, and attempting to spit on Defendants as they were escorting him towards the showers for decontamination from the pepper spray. (Doc. No. 87-3: Aff. of Wilkinson at ¶¶ 13-14). When Plaintiff tried to spit on Defendant Wilkinson, Wilkinson put Plaintiff's body against the wall with his face touching the wall. (Id.). This occurred again at the sally port/sliding door area. (Id.). According to Defendants, no shove or slam occurred.

Defendants have also presented the affidavit of Plaintiff's cell mate, Stephen Somerset ("Somerset"), in support of their summary judgment motion. Somerset attested that before the incident, he and Plaintiff "were having some words with some people on the cell block about a previous uproar." (Doc. No. 87-13: Aff. of Somerset at ¶ 2). Somerset attests that Plaintiff "had

4

been using racial slurs and trying to upset other inmates for 2-3 days. He was still using racial slurs to them in a loud voice. He was upset." (<u>Id.</u>). According to Somerset, Plaintiff hit the intercom and told Defendant Grosch "to do something" and that Plaintiff then told Grosch "not to worry," that he was "going to kick their butt"; "ya'll already know how I am"; that "he could take on any guard and inmate in the building"; and "that he would whip anybody's butt that comes in here thinking that he could do something to me." (<u>Id.</u> at ¶ 3).

Somerset further states in his affidavit that when Defendants first walked into Plaintiff and Somerset's cell, Plaintiff refused to talk to them. Somerset states that Plaintiff then told Defendants to "shut the fuck up" and leave his cell, prompting Defendants to tell Plaintiff that he needed to calm down. (<u>Id.</u> at ¶ 4). Somerset states that, at that point, Defendant Wilkinson told Somerset to leave the cell. (<u>Id.</u> at ¶ 5). Somerset states that as he was sitting outside of the cell, he could hear the parties arguing back and forth but he could not see much of what was going on in the cell, and he did not see either Defendant hit Plaintiff. (<u>Id.</u> at ¶¶ 8-9). Somerset states that when Defendants brought Plaintiff out of his cell he was cussing and his head was bleeding. (<u>Id.</u> at ¶ 13). Finally, Somerset states that when Plaintiff would not obey Defendants' commands to put his hands up against the wall, Defendants pushed Plaintiff hard enough to put his handcuffs on, but not hard enough to hurt him. (<u>Id.</u>).

Corporal Caskey ("Caskey") witnessed many of the events of August 7, 2009. <u>See</u> (Doc. No. 87-4: Aff. of Caskey). He was alerted to the commotion Plaintiff was causing and witnessed Plaintiff's disruptive behavior, including kicking and banging on the cell door, yelling and cussing. (<u>Id.</u> at ¶¶ 9-13). He then saw Defendants approach and enter the cell to attempt to talk to Plaintiff to try to calm him down. (<u>Id.</u> at ¶ 10). Caskey heard Plaintiff yelling and cussing at Defendants, saw Plaintiff lunge from his bunk towards Defendants in what appeared to be an

5

aggressive move, and then witnessed a struggle with Plaintiff and Defendants, who took him to the ground.  (Id. at ¶¶ 10-13).  Caskey observed Defendants emerge from the cell with Plaintiff in handcuffs, as Plaintiff continued to yell and attempt to resist.  (Id. at ¶¶ 10-13).  Caskey also saw Plaintiff jerk his head around and make a motion as if he was attempting to spit on Defendants.  (Id. at ¶ 15).  Caskey saw one of the officers put Plaintiff against the wall outside the cell door near the sally port/sliding doors.  (Id.).

Sergeant Davis ("Davis") also witnessed some of the events of August 7, 2009.  See (Doc. No. 87-5: Aff. of Davis).  Davis recounts that he observed Defendants escorting Plaintiff off of the elevator and that Plaintiff "was very irate and he was cussing saying that he was going to kill everybody, including Officer Wilkinson and Deputy Grosch."  (Id. at ¶¶ 6-7).  Davis escorted Plaintiff to the showers for decontamination from the pepper spray, to medical, and then to the magistrate judge's inmate booking area to face charges for assault on a government official.  (Id. at ¶¶ 8-10).  Davis saw no injury on Plaintiff other than a small amount of blood from a cut on his face, and Plaintiff did not complain about any other injury.  (Id. at ¶ 12).  Plaintiff attempted to persuade Davis to have the matter dropped.  (Id. at ¶ 11).

The nurse who examined and treated Plaintiff immediately after the incident also submitted an affidavit in support of Defendants' summary judgment motion.  See (Doc. No. 87-7: Aff. of Willis).  In her affidavit, Nurse Angela Willis ("Nurse Willis") states that Plaintiff had a scratch on the bridge of his nose and some bruising to his left eye and ear.  (Id. at ¶ 4).  Nurse Willis states that there was no evidence of any other injuries.  (Id.).  Plaintiff made no other complaints and did not present himself for any other treatment at the Gaston County jail.  (Id. at ¶ 10).

Defendants have also produced video footage from the jail during the incident.  (Doc.

Entry dated August 1, 2011: Ex. 14 to Doc. No. 87, Video Footage; Doc. No. 87-6: Aff. of Hunsucker).  The video footage shows Defendants approach and enter the cell, leaving the door open, and Plaintiff's cell mate Somerset walking out of the cell.  (Id.).  There is no video footage of what occurred while Defendants were inside Plaintiff's cell.  See (Id.).  According to the video, two minutes elapsed between the time that Defendants entered Plaintiff's cell and the time they exited the cell with Plaintiff in handcuffs behind his back.  (Id.).  The video footage also shows Defendants placing Plaintiff against a wall at least once at the sally port just outside of his cell.  (Id.).  It is clear that Plaintiff was resisting Defendants before they placed him against the wall.  (Id.).

The video next shows Defendants escorting Plaintiff onto the elevator and then to the shower area.  (Id.).  Plaintiff appears to be holding a white cloth which he periodically places on his face.  (Id.).  The video footage shows Plaintiff walking without assistance, carrying items, and then bending over freely to put on footwear after changing into fresh clothing.  (Id.).  Defendants appear calm from the time they approach the cell until they relinquish Plaintiff to other officers at the shower area.  (Id.).

In an affidavit and an accompanying report, use of force expert Dave Cloutier ("Cloutier") recounts the facts as presented to him by Defendants.  He then opines that the force used by Defendants was "appropriate, necessary, and was utilized as a means to maintain and restore discipline and order within the detention facility environment and was never administered with any malicious or sadistic intent to cause unnecessary pain or suffering."  (Doc. No. 87-14: Aff. of Cloutier at ¶ 8).  Cloutier further opines that Defendants "were justified in their belief and perception that their response to the plaintiff's cell was necessary and prudent to investigate and determine the cause of loud, disruptive and potentially harmful behavior

7

calculated to cause potentially volatile and riotous circumstances. . . . Considering the seriousness of the potentially riotous circumstances, it was incumbent upon the officers to restore order in a timely and appropriate manner and moreover was incumbent upon the plaintiff to heed commands to cease unruly behavior and racial epithets." (Id. at ¶ 10).

      B.    <u>Plaintiff's Evidence in Opposition to Defendants' Summary Judgment Motion</u>

Plaintiff vigorously disputes most, if not all, of Defendants' version of the events that occurred on the evening of August 7, 2009. Plaintiff contends that he was not yelling racial slurs or doing anything to warrant Defendants coming to his cell that night. He states that once Defendants entered his cell, they slammed him into the wall and floor of his cell, maced him, beat him, and then slammed him into the wall twice as they took him to showers and medical. Plaintiff contends that the amount of force used by Defendants was unjustified and that they beat him up for malicious purposes only and not to restore order. Plaintiff has presented, <u>inter alia</u>, the following evidence in response to Defendants' motion for summary judgment: (1) Plaintiff's own sworn declaration; (2) sworn declarations of various inmates; (3) photographs of Plaintiff's injuries; (4) drawings of Plaintiff's cell; (5) the Department of Correction Incident Report; and (6) medical notes from the nurse and physician who treated Plaintiff's injuries.

First, Plaintiff asserts the following relevant facts in his own declaration, made under penalty of perjury, in response to Defendants' motion for summary judgment:

> On August 7, 2009, . . . I was in my cell in the maximum security block of the jail. At around 9:30 pm or 10:00 pm my cell mate, who was also an inmate classified as a "protective custody" inmate was engaged in an argument with an Afro American who was walking around in the common area outside of our locked cell. I then asked my roommate to refrain from using racial slurs in a serious but firm manner. At that point and for no reason, Officer Grosch called across my cell intercom and told me to quote "Shut the fuck up!" I then pressed my intercom button and asked him to not curse me. At that point Officer Grosch then verbally stated "Fuck you." I became agitated and pressed my button again

8

and also stated, "Fuck you" to Officer Grosch. At that point Officer Grosch informed me that he would be at my cell in a minute to quote "Beat my ass." Several minutes passed and nothing happened so I quickly forgot his threat, even though I told him that nobody was gonna come in my cell and do anything to me.

It became quiet in the cell block and my cellmate Bryan Sommerset sat down on my bunk and engaged in a friendly card game forgetting the earlier incident and exchange of words with jail staff and the inmate, as that is a normal day in the jail. People commonly argue from cell to cell to vent their stress and frustrations on a daily basis so we both did not expect anything to happen and not only this but both my cell mate and I were on protective custody so there was zero chance that we would ever be outside of our cell with any other inmate.

The next thing I knew, I heard officers outside of my cell calling to the control booth to "open cell!!" I saw Bryan Sommerset exit my cell and go have a seat on the table in the cellblock. I do not truthfully know exactly what words were exchanged between the officers and I except that Officer Grosch asking me to repeat what I had said to him earlier on the intercom. I stood up and was told to "sit down" at which I compliantly did. I noticed Officer Wilkinson shaking his mace can while Officer Grosch continued to rail at me verbally. I remember briefly averting my attention from Officer Grosch to Officer Wilkinson because the shaking of the mace can was intimidating and distracting. In that brief moment that I had glanced at Officer Wilkinson, Officer Grosch somehow withdrew his mace can and sprayed me with OC pepper spray or tear gas catching me off guard and surprisingly fast.

Out of fear, surprise and reflex I stood and uncontrollably inhaled the steady stream of tear gas that was being projected into my eyes and mouth. My entire face and head was saturated. I began to cough uncontrollably and reached for my eyes and screaming "What did I do" through coughs "I didn't do nothin wrong" I wailed in pain.

The next thing I knew, Officer Grosch rushed into me and flung me into the wall at the head of my bed, then threw me to the left of my cell over my metal desk and wall then tripped me. I was covering my face with my hands and cowering on the floor when he began to violently body punch me on my sides or my lower back. I kept shouting "I didn't do nothin I didn't do nothin." Officer Wilkinson was just standing inside of my cell door at that point like he was blocking the camera or something. At some point Officer Grosch became tired and I felt his sweat drop onto my back as I was face down. I then heard Officer Grosch through rasps tell Officer Wilkinson, Are you scared? Officer Wilkinson replied "No I aint scared."

Then Officer Grosch stated "Well help me then." At that point Officer Wilkinson began to punch me in the head and face with his fists. Officer Grosch had one of

9

my hands behind my back, I was trying to cover my face with my other to shield it from Officer Wilkinson's painful blows to my face.  Then Officer Grosch pulled my right hand behind my back and cuffed me.  My right side of my face was pinned to the floor and my hands were cuffed behind my back when Officer Wilkinson then stated "child molester" and punched me repeatedly in my face that ultimately blacked my left eye and left behind permanent disfiguring scars on the bridge of my nose from his fist.  I believe I also said "Fuck you" to Officer Wilkinson while I was on the floor and that was when he blacked my eye.

Next I was jerked to my feet effortlessly by Officer Wilkinson, considering I was 150 lbs and 5'11" to his bulking 6'2" and 300 lbs. as he admits in the interrogatories.  Officer Grosch also admitted to being 210 lbs. and 5'10".

Then I was pulled out of my cell and flung up against the wall between cells #C and #D I believe.  Officer Wilkinson was trying to slam my face on the wall, I turned my face to the left to try to avoid my face being slammed into the wall which I feared might break my teeth.  I then heard Officer Grosch shouting "Where's my mace can Where's my mace can."  When Officer Wilkinson pulled me off of the wall I forced my tearing and burning eyes open briefly to see Grosch go back into my cell and reach under my bed.  I could only open my eyes briefly due to the burning.  At some point I saw Grosch securing his mace can on his belt which video footage should show although I do not know why he denies using the tear gas on me, and blames Officer Wilkinson.

I was afraid they were gonna hurt me even more when they took me out of the cellblock because I knew from experience that officers would sometimes take inmates out of the cell block and place them into holding cells up front in booking that did not have video surveillance where they are aware of this and frequently assault people in these unsecure areas, so I did slightly resist and plead with him not to take me to booking.  At least in the cell block there were witnesses.  Officer Wilkinson then pushed me into the second wall face first which left another blood streak.  I had felt something like a rib pop in my chest but it also popped when I was on the floor when Officer Grosch had slung me down.

(Doc. No. 91 at 3-6).

In his affidavit, Plaintiff also attests that the morning after the alleged assault by

Defendants, his ribs were hurting "so bad I couldn't stand it."  (Id. at 6).  Plaintiff asserts that

officers refused to take him to see a nurse and that the pain became so intense and acute that he

flooded his cell with toilet water to get attention.  (Id.).  Due to a safekeeping order, on August

14, 2009 Plaintiff was moved from the Gaston County jail to Craven Correctional Institution,

where a nurse evaluated Plaintiff's injuries and photographs were taken.[1]  (Id. at 7; Doc. No. 91-3 at 17).  Plaintiff complained to the examining nurse of injury to his left eye and left upper chest pain due to the altercation with Defendants.  (Id. at 20).  A subsequent Department of Correction incident report noted that Plaintiff had "visible marks on his nose and eye."  (Id. at 22).  On August 18, 2009, a doctor prescribed Naprosyn for pain, swelling, and bruising of Plaintiff's ribs.  (Id. at 28-29).  Photographs taken at the Craven Correctional Institution clearly show bruising around Plaintiff's eye and ear, and a cut on Plaintiff's nose.  (Id. at 45-49).

In response to Defendants' motion for summary judgment, Plaintiff has attached statements from various former inmates at the jail.[2]  (Doc. No. 91-3).  Three of these inmates – Lewis, Moore, and McGill – have since submitted affidavits attesting that they signed statements written by Plaintiff without first reading the statements and that they did not witness Plaintiff's altercation with Defendants.  See (Doc. Nos. 87-10: Aff. of Lewis at ¶ 2; 87-11: Aff. of Moore at ¶¶ 2, 3, 7; 87-12: Aff. of McGill at ¶¶ 3, 5).  Plaintiff also attached a declaration from his former cell mate Somerset, in which Somerset corroborates Plaintiff's version of events.  (Doc. No. 91-3).  Somerset subsequently, however, submitted the affidavit discussed supra, in which Somerset states that Plaintiff was attempting to incite other inmates before Defendants came to their cell

---

[1] A prior safekeeping order had been entered on or about May 29, 2009, ordering Plaintiff to be transferred from the Gaston County jail to the North Carolina Department of Corrections, stating that Plaintiff feared for his safety due to the nature of the sex charges against him, but Plaintiff was not transferred out of the Gaston County jail pursuant to that order.  See (Doc. 91-3 at 3: Safekeeping Order).

[2] All of the statements submitted by Plaintiff were made under penalty of perjury, and some expressly cited to 28 U.S.C. § 1746.  On summary judgment, unsworn declarations made under penalty of perjury that substantially conform to 28 U.S.C. § 1746 are admissible in lieu of sworn affidavits.  See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999).

11

and that Somerset did not see either Defendant hit Plaintiff.  (Doc. No. 87-13: Aff. of Somerset).

Plaintiff also submitted the declarations of former inmates Adair, Wilson, Meadows and McKoy, in which the inmates assert that they overheard Plaintiff in his cell asking Defendants to stop hitting him; that Defendants slammed Plaintiff's face twice against a wall after Plaintiff was outside of his cell; and that when Plaintiff was brought back to his cell the next day, he had "a black eye and half of his face was bruised pretty bad and he had a bandaid across his nose."  All four of these inmates' statements are in the same handwriting.[3]  (Doc. No. 91-3: Declarations of Wilson, Adair, McKoy, Meadows at 33-36, 43).

Plaintiff's summary judgment materials also include a declaration, made under penalty of perjury, by former inmate Mike Cash, who states:

> It was rumored that Officer Grosch and Officer Wilkinson both beat Randy Watterson up one night in cellblock A.  Everybody in jail was talking about it.  So one night during clothes exchange I was joking around and asked Officer Grosch if it was true if Randy got the best of him?  Officer Grosch started laughing and said,
>
> > Watterson talked big shit on his intercom but when we busted his cell door he sat down like a bitch.  When I sprayed him with mace he started crying, I slammed his ass on the floor.  It was funny and Officer Wilkinson was laughing.  Watterson would of been ok except [he] said 'fuck you' to big Wilkinson.  The next thing I know . . . Officer Wilkinson was hammering Watterson's face.  If Watterson would of kept his fuckin mouth shut he wouldn't of got those charges or his ass beat.  How stupid can anybody be?  You don't cuss somebody out when your hands is cuffed behind your

---

[3] Defendants contend that these statements were all written in the same handwriting as the submissions to this Court by Plaintiff.  Defendants note that the express language of Section 1746 requires that statements made under penalty of perjury must be "in writing of such person."  Defendants suggest that these statements are not admissible because they were not written in the hand of the signer.  At least one appellate court, however, has rejected this same argument.  See Williams v. Browman, 981 F.2d 901, 905 (6th Cir. 1992) ("We believe that the stated purpose of 28 U.S.C. § 1746 is accomplished whether the verification statement is handwritten or typewritten and simply undersigned.").

12

> back!

> I got my clothes then went back into my cell.  I wrote a letter to my family and told them what was said and what happened to Randy.  It just so happens that Randy's sister-in-law Christy Davis takes care of my dad who is sick.  When word got back to her from my family about Randy, Christy contacted Randy who contacted me and asked if I [would] sign a statement and I said yes, and I want to testify.

(Doc. No. 91-3 at 38: Decl. of Cash).

Former inmate Marquis Parks also submitted a statement, made under penalty of perjury,

stating:

> That on August 7, 2009, I was an inmate in A-block in the Gaston Co. jail.  I heard Bryan Somerset shouting racial slurs at Brandon Ellis who was in the next cell beside [Somerset's] cell.  Randy Watterson was cellmates with Somerset.  Both Somerset and Watterson were on protective custody 23 hr. lockdown 7 days a week so they were not allowed out of their cell with any of us.  About 30 minutes after everything was calmed down in the cell block I was looking out of my cell when I noticed Officers Wilkinson and Grosch walk over to Watterson's cell. . . . As soon as the cell door opened I saw Somerset exit and go sit on the table in the cellblock.  The whole time Officer Wilkinson had a mace can in his hand.  Officer Wilkinson was standing in Watterson's doorway to his cell, Officer Grosch was inside.  I heard Grosch say sit "down on your bunk."  I could see in the reflection of the cell block windows of the officers' station into Watterson's cell but just a little cause Wilkinson was blocking the doorway.  I saw Watterson sitting on his bunk. Wilkinson shifted his body so I couldn't see momentarily but I heard Randy Watterson holler "What did I do? Why did you mace me?"  The next thing I know I heard punches being thrown as Watterson [was] begging them to stop.  I saw both Officer Wilkinson and Officer Grosch punching Watterson.  It looked like Watterson was face down holding his face with one arm and trying to hold his other arm up to block punches from Wilkinson.  Then I saw Officer Grosch handcuff behind his back Watterson and I then heard Wilkinson call Watterson a child molester and I saw him punch Watterson in the face with his fist then jerk Randy Watterson to his feet and pulled him out of his cell then slammed his face on the wall outside of his cell.  Officer Wilkinson kept telling Watterson to shut up! Then he pulled Watterson off of the wall and jerked Watterson around like the police usually do when they try to act like you are resisting them.  At no time did Randy Watterson try to even fight back at either of those jailers.  At no time did I see him try to spit on or at any of the police.  That is not what happened.  They beat that boy for no reason.  I saw Watterson 1 1/2 years later at Lanesboro prison and told him what I saw.  He asked me if I would make a statement and I said, "yeah," if he would dictate my words on paper.  I am

13

willing to testify to what I saw those police do. In that jail police always beat on people and get away with it. Also at no time did Randy Watterson ever make any racial slurs. I am black and I would know. Randy is my friend and I have never heard him make no racial comments.

(Doc. No. 91-3 at 40: Decl. of Parks).

Former inmate Yakotus Odum also submitted a declaration, made under penalty of

perjury, stating:

> That on 8/7/09 I was an inmate in the Gaston County jail in A block. That Bryan Steven Somerset was in the cell with Randy Watterson and was saying racial slurs. Randy Watterson never made any racial slurs. I saw officers S. Wilkinson and M. Grosch enter the cell block around 10 or 11:00 pm on this date. They walked over to Randy Watterson's cell, opened his door then told him to sit down. Then I heard Watterson saying "What did I do? Why did you spray me?" Then I heard Randy saying "stop hitting me, I didn't do nothin." I could hear shuffling sounds and punches being thrown. Next I saw Officer Wilkinson pull Randy out of the cell then slam his face up against the wall outside of his cell for no reason. Blood was on the wall. At no time did Randy Watterson spit on or at either officers or even try to fight back. He was begging them to stop. When Officer Wilkinson was walking Randy across the cell block he was jerking Randy around simulating that Randy was resisting. When he took Randy to the sally port Officer Wilkinson again slammed Randy's face on the wall and left a big smear of blood on the wall. There was no reason for officers to come in and take Randy out of his cell cause he was not doing nothin wrong. Randy was not hitting or kicking his cell door or nothin. Everybody saw what they did to Randy and it was wrong. At no time did Randy ever say any racial slur to anybody, it was his roommate Sommerset. I am black and I know what was said and done and Randy did not do nothin to deserve getting beat up as bad as they beat him. I will testify to all of this. Jailers in the Gaston County jail have been known to be racial themselves and to beat on inmates. They have beat inmates up for years and something needs to be done. I make this statement of my own free will. I saw Randy Watterson at Lanesboro prison and told him what I knew. He asked me to make a true statement and I did.

(Doc. No. 91-3 at 41: Decl. of Odum).

Also included in Plaintiff's response to the summary judgment motion is a declaration

from former inmate Tywan Robinson, who attests that he was locked down by Defendant

Wilkinson in February 2010 for five days; that Wilkinson told Robinson that he could not wait

14

until Robinson got out of jail and that "he hates my black ass"; and that Robinson is "extremely fearful for [his] safety because this officer is racially bias[ed] and has threatened [his] safety." (Doc. No. 91-3 at 42: Decl. of Robinson). Similarly, Plaintiff has submitted a declaration, made under penalty of perjury, by former inmate Bart Heavener ("Heavener"). Heavener states that while he was a pre-trial detainee at the jail in 2002, guards beat him up for no reason and guards routinely use excessive force against inmates at the jail. (Doc. No. 91-3 at 37: Decl. of Heavener).

Plaintiff also submitted a declaration, made under penalty of perjury, by former inmate Patelle Hill, stating:

> In May of 2009 and while in the Gaston Co. jail I saw Officer Grosch beat a mexican boy up real bad for no reason. I told the officer what he done to that boy was wrong, Officer Grosch then said, "shut up nigher [sic], you want some too?" I knew better than to argue with the officer cause I did not want to get beat up. Also I knew he was a racist. Just last week I ran into one of my white friends name Randy Watterson, we got to talking and I told him about what I saw that same officer do to a mexican. He asked me if I would make a statement so I did. I did because those jailers have been getting away with beating on people all of the time and somebody needs to put a stop to it, everybody that's been in that jail knows this to be true. I am afraid to testify but I will testify in state and federal court if it will change things in that jail and make it safe for everybody but I don't want to get myself hurt. I have made this statement truly and voluntarily without any promise of gain.

(Doc. No. 91-3 at 44).

Finally, on March 8, 2012, Plaintiff submitted an additional declaration in which he contends that his son Andy Lee Watterson "has communicated to me that one night during 2010, that while he was a juvenile and while confined in the Gaston County Jail in Gastonia N.C. that [Defendant] Wilkinson . . . . [and] Caskey . . . entered my son's cell and physically did injure and assault my son by punching him with their fists . . . . Andy told me that [Defendant] Wilkinson openly stated before assaulting him, 'I had to teach your daddy a lesson so I guess I'll teach you

15

now.'" (Doc. No. 95 at 1).

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for

16

the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. ANALYSIS

"[E]xcessive force claims of a pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment." Young v. Prince George's Cnty., Md., 355 F.3d 751, 758 (4th Cir. 2004) (quoting Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998)). To succeed on such a claim, a plaintiff must show that defendants "inflicted unnecessary and wanton pain and suffering." Id. In adjudicating an excessive force claim, the court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and whether the force was "applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973); see also Whitley v. Albers, 475 U.S. 312, 320-21 (1986). Furthermore, the Supreme Court has recently reiterated that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 130 S.Ct. 1175, 1178-79 (2010) (per curiam). In Wilkins v. Gaddy, the Supreme Court observed:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.

17

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.

Id. at 1178-79 (citations omitted).

The Court first notes that it is clear that seven of the declarations Plaintiff submitted were handwritten by him. Of the seven declarants, Moore, Lewis, and McGill subsequently issued affidavits recanting the statements made in their earlier declarations. The declarations of inmates Adair, Wilson, Meadows, and McKoy were also written in Plaintiff's handwriting. Defendants contend that all of the declarations that were written in Plaintiff's handwriting must be excluded as inadmissible. The Court need not determine whether such declarations must be excluded because, as discussed infra, Plaintiff has presented additional declarations that raise a genuine issue of fact as to whether Defendants applied excessive force against Plaintiff.

Next, as to the statements by several inmates regarding Defendants' statements, threats, and conduct towards those inmates while they were at the Gaston County jail, these statements are not admissible on summary judgment. See FED. R. EVID. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); FED. R. CIV. P. 56(c) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. . ."). While reserving judgment on the admissibility of any or all of these statements at trial, the Court has not considered these statements in addressing Defendants' motion for summary judgment.

The Court finds, nevertheless, that the admissible evidence presented on summary judgment raises a genuine issue of fact as to whether Defendants used excessive force against Plaintiff in violation of Plaintiff's due process rights under the Fourteenth Amendment.

Crediting Plaintiff's version of the facts, it appears that Defendants punched Plaintiff after he

was handcuffed. <u>See</u> (Doc. No. 91: Decl. of Plaintiff) ("Officer Grosch pulled my right hand

behind my back and cuffed me. . . . Officer Wilkinson then stated 'child molester' and punched

me repeatedly in my face . . . ."); (Doc. No. 91-3: Decl. of Parks) ("Then I saw Officer Grosch

handcuff behind his back Watterson and then I heard Wilkinson call Watterson a child molester

and I saw him punch Watterson in the face . . . ."). Plaintiff's allegation that Defendants

assaulted him after he was handcuffed, corroborated by inmate Parks's declaration, raises a

genuine issue of material fact and precludes this Court from granting summary judgment. <u>See</u>

<u>McMillian v. Wake Cnty. Sheriff's Dep't</u>, 399 Fed. App'x 824, 828 (4th Cir. 2010) ("[W]e

cannot say, as a matter of law, that knocking down, punching, and kicking an arrestee while he is

in handcuffs are actions taken in good faith to restore order."); <u>Young v. Prince George's Cnty.</u>,

355 F.3d 751, 756-58 (4th Cir. 2004) (vacating order granting defendant police officer summary

judgment on plaintiff's Fourth Amendment excessive force claim, in which plaintiff alleged

officer assaulted him after he was placed in handcuffs); <u>Jones v. Buchanan</u>, 325 F.3d 520, 529

(4th Cir. 2003) (noting factual dispute over whether plaintiff was handcuffed and that plaintiff

might be unable to prove that he was in fact handcuffed, but suggesting that whether plaintiff

was handcuffed was highly relevant to assessment of the reasonableness of the officer's

conduct); <u>see also</u> <u>Orem v. Rephann</u>, 523 F.3d 442, 446-47 (4th Cir. 2008) (upholding denial of

qualified immunity defense asserted by police officer who used a taser on a suspect after she was

handcuffed and restrained).

      Other admissible evidence presented on summary judgment also raises a genuine issue of

fact as to whether Defendants used excessive force against Plaintiff. First, Plaintiff sustained

injuries from the altercation with Defendants – namely, a cut to his nose, bruising around his eye

19

and ear, and bruising of his ribs.  See Wilkins, 130 S.Ct. at 1178 ("[T]he extent of injury suffered

by an inmate is one factor that may suggest 'whether the use of force could plausibly have been

thought necessary' in a particular situation.") (quoting Hudson v. McMillian, 503 U.S. 1, 7

(1992)).

Second, the parties have submitted sworn statements that contradict each other and that

raise issues as to Plaintiff's conduct before Defendants used force against him, as well as the

amount of force used by Defendants.  Assuming Plaintiff's version of events, a reasonable jury

could find that the force used by Defendants Wilkinson and Grosch was not applied in a good

faith effort to maintain and restore discipline but was, rather, applied maliciously and sadistically

for the purpose of causing Plaintiff harm.  At least one other inmate at the jail attested that it was

Somerset, not Plaintiff, who was yelling racial slurs on the night in question.  Parks attested that

he could see partially into Plaintiff's cell during the altercation, and Parks's version of the events

corroborates Plaintiff's version.[4]  Inmate Odum also attested that he "heard Watterson saying

'What did I do?  Why did you spray me?'  Then [he] heard Randy saying 'stop hitting me, I

didn't do nothin.'"  (Doc. No. 91-3: Decl. of Odum).  Odum then heard "shuffling sounds and

punches being thrown."  (Id.).

Defendants insist that Plaintiff's and the other inmates' versions of what occurred on the

night in question are simply not credible.  Defendants note that some of the inmates' statements

were written in the same handwriting as Plaintiff's.  It is true that some of the inmates'

_____

[4] Defendants contend that the videotape footage indisputably shows that none of the other
inmates could see into Plaintiff's cell.  The Court does not agree that the videotape footage
establishes this as an undisputable fact.  Inmate Parks testified that he could partially see into
Plaintiff's cell through the reflection of the cell block windows on the officers' station, although
Defendant Wilkinson was blocking the doorway.  The videotape footage does not reveal the
location of either the officers' station or Parks' cell.

20

statements are identical to one another so that they appear to be copies of the same statements, purportedly all written by Plaintiff. It is not an unusual occurrence in litigation that statements are drafted, typed or otherwise prepared by one party for execution by a witness. Even assuming that the method of preparation affects the credibility the Court ought to assign to the proffered statements, the Court also has before it several admissible inmate statements that do not appear to be in the same handwriting as Plaintiff's statement – namely, the statements of Cash, Parks, and Odum. These statements are not identical, and support Plaintiff's version of the events on the night in issue. Finally, the Court also has before it Plaintiff's own declaration, made under penalty of perjury, which disputes Defendants' version of events.

The Fourth Circuit recently reversed summary judgment in another excessive force case in which there were competing affidavits, noting that it is up to a jury, not the court, to assess the credibility of the competing declarations. See Watson v. Brown, 446 F. App'x 643, 645 (4th Cir. 2011) ("[The parties'] factual assertions effectively boiled down to a swearing contest backed chiefly by parties' own affidavits. . . . The district court therefore erred when it made a dispositive credibility determination on the basis of the competing affidavits."). In sum, drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has established that there is a genuine issue of material fact as to whether Defendants' application of force was an attempt to restore discipline, or maliciously and sadistically to cause Plaintiff pain.

Finally, the Court has reconsidered Plaintiff's earlier Motions for Appointment of Counsel, (Doc. Nos. 18; 32). Appointment of counsel under § 1915(e)(1) in cases brought under 42 U.S.C. § 1983 is discretionary. Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Ct., 490 U.S. 296, 298 (1989). Counsel should only be appointed in "exceptional circumstances." Id.; Cook v. Bounds, 518 F.2d 779

(4th Cir. 1975).  The existence of "exceptional circumstances" depends upon two factors: type and complexity of case and ability of the pro se litigant to present his case.  <u>Whisenant</u>, 739 F.2d at 163.  Given that the Court is denying summary judgment, the Court will take Plaintiff's motion for counsel under advisement and will issue an Order within thirty (30) days.

## V.      CONCLUSION

In sum, the Court finds that there are genuine disputed issues of material fact as to whether Defendants used excessive force against Plaintiff.  Therefore, summary judgment is not appropriate.

**IT IS, THEREFORE, ORDERED** that Defendants' motion for summary judgment, (Doc. No. 87), is **DENIED**.

Signed: March 29, 2012

Robert J. Conrad, Jr.
Chief United States District Judge